UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL ANTHONY MORAN,<br><br>Petitioner,<br><br>v.<br><br>MARTIN BITER, Warden,<br><br>Respondent. | Case No.  5:14-cv-02641-EJD<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Re: Dkt. No. 1 |

## I.  INTRODUCTION

Petitioner has filed a petition for a writ of habeas corpus under 28 U.S.C. §2254 challenging his state conviction.  Respondent filed an answer on the merits (Dkt. 14) and Petitioner filed a traverse (Dkt. 23).  For the reasons set forth below, the petition for a writ of habeas corpus is DENIED.

## II.     BACKGROUND

On July 8, 2010, a jury found Petitioner guilty of forcible rape (Cal. Penal Code §261(a)(2)) and forcible oral copulation (Cal. Penal Code §288a(c)(2)) against Jessica Doe and continuous sexual abuse of a child under the age of 14 (Cal. Penal Code §288.5(a)) against Andrea Doe.  The court sentenced petitioner to two consecutive 15-year-to-life terms in state prison.

On November 28, 2012, the California Court of Appeal, First Appellate District, affirmed the judgment in an unpublished decision.  Dkt. 16-3.  The California Supreme Court denied review on March 13, 2013.  Dkt. 16-4.

### A. Statement of the Facts

The California Court of Appeal summarized the facts of the case as follows:

**Jessica Doe**

In May 2008, Jessica Doe was 16 years old and lived with her family in the Baywood Apartments in Hayward. Defendant, his wife Melissa Moran, and their three children lived in the same apartment complex and Jessica was friendly with them. Jessica often went to their apartment to socialize with the family, play with their X-Box, or use their computer.

On May 23, 2008, Jessica went to the Morans' apartment to visit. While she was there, Melissa decided to take the children to Jack in the Box, which was "right around the corner." Jessica did not want to go, and stayed behind in the apartment, playing on the computer. Defendant did not go either. Melissa and the children were gone 15 to 17 minutes at most.

After Melissa left with the children, defendant told Jessica to "get up." Defendant pushed her onto the bed, falling on her and holding her wrists down over her head. Defendant weighed 300 pounds; Jessica weighed 120. Jessica tried unsuccessfully to wiggle out from under him. Defendant said if she tried to stop him, he would hurt her.

Defendant kissed Jessica's lips and cheek. Jessica kept her lips tightly closed, except when she yelled and screamed. Defendant kissed Jessica's neck while he moved her blouse and bra out of the way. Then he kissed Jessica's breasts. Defendant kissed Jessica's stomach, pulled down her clothes and put two fingers in Jessica's vagina and moved them in and out with "all of his might" about five times. It was painful and Jessica screamed loudly.[1] Next, defendant orally copulated Jessica for 10 to 15 seconds. Then defendant put his penis in Jessica's vagina, pulled it all the way out, and put it back in about five or six times. The pain of the first insertion caused Jessica to scream, but then defendant's threats and the pain caused her to stop resisting. Next, defendant gestured for Jessica to perform oral sex on him, and pushed Jessica's head down to make her do it. About 10 seconds later, Jessica heard what sounded like the front door knob turning. Defendant went into the bathroom. Jessica got dressed and went home.

At home, Jessica urinated and saw blood on the toilet paper after she wiped herself. She told her mother that defendant had raped her. They decided to inform Melissa and then call the police.

When Melissa returned with the children, defendant was in the bedroom. She asked where Jessica was, and defendant replied that she had gone home. About 30 minutes later, Jessica and her mother came to the Morans' apartment. Jessica's mother told Melissa that defendant had raped Jessica. Melissa exclaimed, "What if he did this to one of my other kids?"

Jessica and her mother left, and Melissa went back into her house and told defendant something like, "I'm sure you know what this is about." He nodded affirmatively. Melissa then told defendant that Jessica and her mother were going to call the police.

After Jessica and her mother left, they went home and called the police. When the police arrived, they asked Jessica some basic questions and requested that she change her clothes. Jessica bagged the clothes she had been wearing and gave the bag to the police.

---

[1] A neighbor testified that she heard "screaming, yelling, and a door slam."

Hayward Police Officer Michael Carpenter then went to defendant's apartment with some other officers. As soon as defendant saw the police standing in the doorway, he said, "I knew you were coming." Carpenter asked defendant to accompany them outside and defendant complied. As they walked slowly to a nearby parking lot, defendant said, "I made a mistake," and said he was sorry several times. Jessica was brought to defendant's location in a police car from which she identified defendant. Defendant was then arrested.

Jessica was taken to a hospital where she was examined by a physician's assistant. She reported that defendant had digitally penetrated her for about 10 seconds, penetrated her vagina with his penis five times, orally copulated her twice, and made her orally copulate him once. She said she had vaginal pain and bleeding. Jessica was unable to tolerate a speculum exam due to the pain. The physician's assistant documented various injuries to Jessica's vaginal area and concluded that his observations were consistent with the history Jessica had given.

**Andrea Doe**

Andrea Doe is Melissa Moran's daughter from a previous relationship and defendant's stepdaughter. She was 12 years old when she testified at trial in June of 2010.

Approximately a week after defendant was arrested, Andrea first disclosed to her mother that defendant had molested her, because her mother kept asking her if defendant had done anything to her. She did not tell her mother everything at first, but she did disclose more details to her aunt Laura who worked in a courthouse. Two days later, Melissa called the police.

Andrea and Jessica were good friends, and she was aware of Jessica's rape accusation against defendant.[2] However, she was not accusing defendant of molesting her to help Jessica. She was adamant about telling what defendant did to her "[b]ecause he actually did that to me."

Andrea testified that when she was eight or nine defendant first tried to put his "private" in her "private."[3] It "stung a little," and Andrea said to defendant, "Wait." Defendant didn't stop, but said to her, "Hold on." Andrea then said she needed to go to the bathroom although she really didn't need to go. Defendant let her leave. She made up having to go to the bathroom because she didn't want to be hurt anymore and wanted to clean herself off.

A second incident occurred, but Andrea could not recall when. It was the same as the first incident except that this time defendant wanted her to "lick his private," but Andrea wouldn't do it.

A third incident occurred when Andrea and her sister were watching television. Defendant told her sister to go into another room, which she did. Then defendant pulled down her pants and again tried to put his private in her private. Andrea made a noise because it hurt a little. Another time, defendant tried to put his private in her "butt" while she was on her stomach.

The last incident occurred a week or two before defendant's arrest. He again attempted vaginal intercourse with her, and tried to make her lick his private. Andrea felt slimy, sticky stuff on her private. Defendant's private was "long, hairy, and it had slimy stuff and it had a

---

[2] A couple of days after defendant's arrest, Jessica told Andrea and some other friends that defendant had raped her. Jessica did not provide any specific details.
[3] Referring to anatomical drawings of male and female bodies, Andrea described both the vaginal area and penis as "privates" and used that terminology in her testimony.

Case No.: 5:14-cv-02641-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

3

tiny hole." The incidents occurred about three months apart.

**The Defense Case**

Melissa testified that Jessica and defendant did not have much contact, other than small talk. Melissa admitted that she frequently called Andrea "bitch" and other names, and hit Andrea. Melissa never saw any signs that would lead her to believe defendant was molesting Andrea, and she believed she would have been sensitive to such signs because she herself had been molested as a child. She thought defendant and Andrea "got along good." According to Melissa, Andrea was "known to exaggerate" or fabricate things when she falsely claimed to be a cheerleader, or play on a sports team.

Sometime after defendant's arrest, Melissa had a conversation with Jessica about the rape. Jessica discussed it calmly and did not appear upset. According to Melissa, Jessica said defendant had put his mouth on her privates and then added, "Yeah, you know, he didn't even know how to do that right. At least if you're going to rape somebody, you should at least make it feel good."

Defendant's 17-year-old sister testified Jessica had once told her that defendant was handsome, or would be, if he were thinner.

A week after defendant's arrest, Andrea talked to a female friend of defendant. Andrea was giggling and laughing. Andrea also said she had walked into her parents' bedroom and seen them without clothes on. This friend described Andrea as clingy with adults "for a lot of attention."

Defendant's mother testified that defendant, Melissa and Andrea had lived with her starting in 2003 for about 15 months. During that time, Andrea sometimes lied about whether she had gone to school that day. Andrea was strong-willed, and an attention-getter. Once, during a work day, defendant's mother saw defendant and Jessica sitting alone in defendant's car.

The defense also called Officer Kenneth Landreth, who had taken Jessica to the hospital and interviewed Jessica there. Except for a few omissions, Jessica's statement to Landreth was consistent with her trial testimony. For example, Jessica did not tell Landreth that defendant had kissed her lips, or that he inserted his fingers in her vagina five times.

Dkt. 16-4, pp. 257-261 (footnotes in original).

## III.    DISCUSSION

### A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume to be correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Here, the California Supreme Court summarily denied Petitioner's petition for review. Dkt. 16-4. The California Court of Appeal addressed the claims in the instant petition. Dkt. 16-3. The

Court of Appeal thus was the highest court to have reviewed Petitioner's claims in a reasoned decision, and accordingly it is the Court of Appeal's decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, a federal habeas court must give a heightened level of deference to state court decisions. See Hardy v. Cross, 565 U.S. 65 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Id. at 1307 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

### B.       Claims and Analysis

Petitioner asserts the following grounds for relief: (1) the trial court erred in admitting Petitioner's "in-custody statements in the absence of Miranda advisements, depriving petitioner of due process of law under the Fourteenth Amendment"; (2) the trial court's exclusion of evidence violated Petitioner's right to present a defense under the Fifth, Sixth and Fourteenth Amendments; (3) prosecutorial misconduct during *voir dire* and closing argument violated Petitioner's right to a fair trial and right to counsel under the Fifth, Sixth and Fourteenth Amendments; and (4) the cumulative effect of error deprived Petitioner of a fair trial.

### i.       Claim re Miranda Violation

Petitioner argues that the trial court violated his due process rights by admitting as evidence the statements he made to police on the day he was arrested. The state appellate court rejected Petitioner's claim, finding that Petitioner's statements were volunteered rather than the product of interrogation. The state appellate court reasoned as follows.

At a pretrial hearing on defendant's motion to exclude evidence of his statements to police,

Officer Carpenter testified about the circumstances surrounding defendant's arrest. When he and Officer Troche arrived at the apartment complex, other officers were already in the parking lot speaking with Jessica Doe. Carpenter and Troche went to defendant's apartment and were met by defendant's wife, Melissa, who told them she knew why the officers were there. She said Jessica's mother had come over to her house and told her that her husband, Michael Moran, had just assaulted Jessica. Melissa said her husband was in their apartment and she led the police officers there. When Melissa unlocked the door, defendant was standing in the living room. Carpenter asked defendant "'if he [could] come outside and talk to us.'" Carpenter "didn't want to talk to him in front of the kids," although Carpenter did not say that to defendant. "And [defendant] said, 'I know why you're here,' and he walked out with us."[4] Defendant was not handcuffed. "We were just walking." At this point, Carpenter had not talked to Jessica and did not have any information about what had taken place.

They had walked about 20 feet, around the corner from the apartment into the parking lot when defendant said, without Carpenter asking him anything, "I made a mistake" and repeatedly said he was sorry. At that point, Carpenter asked defendant why he was sorry and defendant replied that he had kissed her. Carpenter asked a few questions to which defendant gave incriminating answers. Defendant was cooperative, emotional, weepy, and "there was a lot of silence" between defendant and Carpenter. Defendant and the officers were all waiting for Sergeant Krim to let them know the next step. After defendant finished telling Carpenter his story, Carpenter was advised by radio that the victim was being brought over to their location for an in-field show-up, and Carpenter advised defendant what was happening. Later, at the police station, defendant was *Mirandized*, waived his rights, and made more incriminating admissions.

Defendant also testified about his arrest at the hearing. His wife said the police were at their house and defendant made his way to the front door. At that time, defendant did not know anything about Jessica's accusation; his wife had not told him anything.

Five officers were standing in the walkway. According to defendant, one of the officers "ordered me to come out because he needed to talk to me." The officers then escorted him to the parking lot and ordered him to sit down on the curb. At this point, defendant did not feel free to leave, and Officer Carpenter started asking him questions about what had happened between him and Jessica Doe. He made some statements at that point. After the officer explained why he was there, defendant said he was sorry. He never said ["]I know why you're here." Officer Carpenter did not advise him of his *Miranda* rights before questioning him.

The trial court ruled that whether defendant said, "I know why you're here," or "I knew you guys were coming" was a jury question. Either statement was admissible because it did not appear to be the product of any interrogation, whether or not defendant was in custody. Defendant's statements that he had made a mistake and was sorry were also admissible because they were voluntarily made, there was no interrogation, and the totality of the circumstances were not so coercive as to render his statements involuntary. However, the court ruled that all subsequent statements were the product of custodial interrogation and inadmissible. Finally, the court found that defendant's statement at the police department, made after advisement of rights, was admissible as a free, knowing, voluntary waiver of *Miranda*.[5]

On appeal, we "accept the trial court's resolution of disputed facts and inferences, as well

---

[4] Officer Carpenter also testified that defendant said, " 'I knew you guys were coming.' "
[5] Despite the court's ruling the prosecutor did not introduce evidence of defendant's *Mirandized* statement.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
7

as its evaluation of the credibility of witnesses where supported by substantial evidence." (*People v. Cruz* (2008) 44 Cal.4th 636, 667.) We will uphold the trial court's findings as to the circumstances surrounding a confession if supported by substantial evidence (*People v. Boyette* (2002) 29 Cal.4th 381, 411.) *Miranda*, *supra*, 384 U.S. 436 requires the exclusion of any statement made by a suspect during custodial interrogation, if the suspect has not been advised "prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Id.* at p. 479.) "Interrogation" means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301.) Spontaneous or volunteered statements are not made inadmissible by *Miranda*. (*Miranda*, *supra*, 384 U.S. at p. 478.)

Apparently relying on his own version of events –that "he was asked by Officer Carpenter what happened between him and Jessica prior to being advised of his rights. He then made statements" –defendant argues he "was asked his side of the story as he was being moved. . . ." He also asserts that the officers "ordered him to leave his home, ordered him to sit down and wait for a lineup, and told him they came to get his side [of] a story on a fresh rape complaint." Based on this scenario, he asserts, "it is clear" he was interrogated, or its functional equivalent, "and . . . the police should have known their actions were reasonably likely to elicit an incriminating response."

Here, the trial court credited Officer Carpenter's version of events over defendant's version, a credibility determination which we are not at liberty to disregard. According to Officer Carpenter, defendant made the challenged admissions without any prompting or questioning. He made the first statement—which defendant denied making at all—while he was still in his living room, after Officer Carpenter asked if he would step outside to talk. He made the second statement, according to Carpenter, spontaneously, after walking to the parking lot, and before Carpenter asked him any questions at all. In fact, according to Carpenter, it was defendant's volunteered statement that he was sorry that prompted Carpenter to ask defendant why he was sorry.

Defendant does not argue that, under Officer Carpenter's version of events, the police engaged in interrogation or its functional equivalent. In our view, Officer Carpenter's initial words to defendant—" 'if he could come outside and talk to us' "—were not such that the police "*should have known* [they] were reasonably likely to elicit an incriminating response." (*Rhode Island v. Innis*, *supra*, 446 U.S. at p. 302.) On the contrary, it appears to us that the request to step outside was the type of words or actions that normally attend arrest and custody, and therefore, fall outside the ambit of *Rhode Island v. Innis*, *supra*, at page 301. Officer Carpenter's testimony provides substantial evidence for the court's factual findings. Those findings, in turn, establish defendant's statements were not the product of interrogation or its functional equivalent. No error appears.

Dkt. 16-3, pp.261-264 (footnotes in original).

<u>Analysis</u>

The requirements of <u>Miranda</u> are "clearly established" federal law for purposes of federal

habeas corpus review under 28 U.S.C. § 2254(d). <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1271 (9th Cir.

2005); <u>Jackson v. Giurbino</u>, 364 F.3d 1002, 1009 (9th Cir. 2004). <u>Miranda</u> requires that a person

Case No.: 5:14-cv-02641-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

subjected to custodial interrogation be advised that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." <u>Miranda v. Arizona</u>, 384 U.S. at 444. The warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action. <u>Id.</u>

"[I]nterrogation means questioning or 'its functional equivalent,' including 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" <u>Pope v. Zenon</u>, 69 F.3d 1018, 1023 (9th Cir. 1995) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)) (confronting suspect with incriminating evidence linking him to crime plus pre-<u>Miranda</u> advisement interrogation violated <u>Miranda</u> and not cured by later defective <u>Miranda</u> advisement), <u>overruled on other grounds by</u> <u>United States v. Orso</u>, 266 F.3d 1030 (9th Cir. 2001). General "on-the-scene questioning" concerning the facts and circumstances surrounding a crime or other general questioning of citizens during the fact-finding process do not trigger <u>Miranda</u> warnings. <u>See</u> <u>id.</u> at 477-78. There is an exception to the general rule regarding "functional equivalent" of interrogation when an officer is engaged in actions which are normally attendant to arrest and custody. <u>See</u> <u>United States v. Younger</u>, 398 F.3d 1179, 1186 (9th Cir. 2005) (finding that police identification of defendant as person who threw backpack containing contraband onto the roof was attendant to arresting and taking defendant into custody and therefore not covered by <u>Miranda</u>); <u>see also</u> <u>Kemp v. Ryan</u>, 638 F.3d 1245, 1256 (9th Cir. 2011) (finding that officer's inquiry as to petitioner's protective custody status "qualifies as a question that is 'normally attendant to . . . custody,'" and thus such an inquiry is not covered by <u>Miranda</u>).

Here, the state appellate court's rejection of Petitioner's Miranda claim was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. The trial court's factual determinations were entitled to a presumption of correctness under 28 U.S.C. §2254(e)(1). <u>See</u> <u>Thompson v. Keohane</u>, 516 U.S. 99, 112-13 (1995). At trial, the court credited

Officer Carpenter's version of events over Petitioner's version. Among other things, the trial court accepted Officer Carpenter's testimony that he asked Petitioner to come outside and talk to the police. Dkt. 15-5, p. 22. Based upon Officer Carpenter's version of events, the trial court ruled that Petitioner's alleged statement, "I know why you are here," or "I knew you guys were coming" was not the product of any interrogation. Id. Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 433-34 (1983); see also Anderson v. Bessemer City, 470 U.S. 564, 575 (1985) ("only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."); Sophanthavong v. Palmateer, 378 F.3d 859, 867 (9th Cir. 2004) ("because the state court conducted an evidentiary hearing in which Mr. Sophanthavong testified, we are required to defer to the state court's credibility findings).

The state appellate court reasonably determined that Officer Carpenter's request for Petitioner to come outside and talk to the police was not such that he "should have known [they] were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, supra, 446 U.S. at p.302. "[N]ot every question posed in a custodial setting is equivalent to 'interrogation.'" United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981). The state appellate court reasonably determined that Officer Carpenter's request was the type of words or actions that normally attend arrest and custody. See id. at 1238 (questions relating to Booth's identity, age and residence were not likely to elicit an incriminating response).

The state appellate court also reasonably determined that Petitioner's statements that he "made a mistake" and was "sorry" were voluntarily made based upon the trial court's factual determinations. As stated previously, the trial court credited Officer Carpenter's testimony regarding the circumstances under which the statements were made. Officer Carpenter testified that he and Petitioner were just walking when Petitioner made the statements without Officer Carpenter asking him anything. Dkt. 15-5, p. 222. The trial court noted that Petitioner was not in handcuffs and that the officers were not "holding on to him." Id. at p. 212. The trial court also

noted that "[t]hey were walking but there were several officers there. They didn't have their guns out." Id. These factual determinations are presumed to be correct pursuant to 28 U.S.C. 2254 (e)(1). The trial court found that the totality of circumstances were not coercive or such that the statements were involuntary when made. Id. at p. 213. Petitioner's statements therefore were not the product of custodial interrogation.

Moreover, Petitioner has not established that admission of any of the statements at issue had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). The statements were a minor part of the prosecution's case. Furthermore, they were not outright confessions. The state appellate court's rejection of Petitioner's claim of Miranda violation was not objectively unreasonable.

### ii. Claim re Exclusion of Evidence that Andrea Doe Made a Report of an Intruder In Her Bedroom

Petitioner contends that the trial court abused its discretion by excluding evidence that Andrea Doe had previously reported to the police that a night-time intruder had entered her bedroom and kissed her, and that the report may have been false. Petitioner contends that the excluded evidence was relevant to challenge Andrea's credibility and was admissible to show that she had a character trait for fantasizing. The state appellate court concluded that the evidence was admissible under Evidence Code section 1103, subdivision (a)(1), but that the trial court did not abuse its discretion in excluding the evidence under Evidence Code section 352. The state appellate court summarized the trial court proceedings as follows:

> On the morning testimony was to begin, the prosecutor moved for an order preventing defense counsel from questioning Andrea about a prior report she made to police that an intruder had entered her bedroom in the middle of the night and kissed her on the face. The matter was discussed extensively. The next day, defense counsel filed a "Memorandum of Law Re: Admissibility of 2007 Prowling Incident Involving Andrea Doe." The memorandum included an offer of proof based on a Hayward Police Department report by Officer C. Olthoff which was attached as an exhibit. Citing Evidence Code section 1103, subdivision (a)(1), defense counsel sought a ruling from the court allowing him to introduce at trial evidence that Andrea Doe had made a prior false report of a burglar who entered her bedroom at night, kissed her, touched her hair, and whispered reassurances to her.

> According to the police report, on August 25, 2007, at 3:21 a.m., Hayward police responded to a call from defendant's residence about a possible burglary in progress. Defendant had called the police after Andrea, then nine years old, woke up screaming that

someone was inside her bedroom. Before calling the police, defendant had searched the house and found no one. He noticed that the patio sliding glass door was partially open. "[H]e did not recall the sliding glass door open prior to him going to bed and he usually closes it prior to going to his bedroom." "[A]ll of the other doors and windows of the residence were still secured and did not appear to have been tampered with."

Andrea told her mother that "she was sleeping when an unknown male walked into her room and began trying to kiss her." Andrea described the intruder to her mother as a gum-chewing, spiky-haired Hispanic teenager wearing black pants.

Andrea told Officer Olthoff that she was sleeping on her stomach facing away from the bedroom door, when "she saw a male walk into her bedroom, pause by the bedroom door and then walk directly toward her. Once the male got next to her bed, [he] moved her hair from her face and began kissing the right side of her face as he told her that everything was going to be OK. [Andrea] said that she immediately woke up and told the male that she was going to tell her mom that he was there and immediately began crying out for her mom as she sat up and moved toward the other side of her bed. [Andrea] said that at that time, the unknown male ran out of her bedroom. Immediately after the unknown male ran out of her bedroom, [Andrea's mother] ran into the bedroom. Immediately after the unknown male ran out of her bedroom, [Andrea's mother] ran into the bedroom to check on [her]." Andrea described the intruder to Olthoff as a Hispanic male, possibly in his late teens, wearing a black sweatshirt, black pants with white stripes on the legs, sporting spiky hair and chewing white gum.

Officer Olthoff was skeptical of Andrea's account. He noted that the lights were off, and Andrea could not explain why she could see the color of the gum; there was a pile of plastic items and other miscellaneous clothing and paper lying next to the side of the bed, but Andrea did not hear the man step on the pile when he approached the bed. When Olthoff said he didn't understand how the man could have knelt down without her hearing him step on the plastic items, she said she would show him exactly what happened and then "proceeded to walk to the entrance to her bedroom and act out how the male walked into her bedroom and approached the side of her bed as if she was acting out a movie she had just watched." Andrea admitted that she had recently watched a movie called "Faces of Death" at a relative's house that her parents would not usually allow her to watch. Asked if she was sure someone was inside her residence, Andrea "stated that it could have been just a dream."

Olthoff reported that defendant and his wife "said that they also were suspicious of [Andrea's] story and stated that [Andrea has exaggerated stories before." They thought Andrea "was only having a dream until they noticed the sliding glass door was partially opened." Neither of them thought they had left the door open, but were not sure. A search of the area by several officers failed to turn up any possible suspects.

The following summer, on July 17, 2008, Officer T. Decosta was assigned to do a followup investigation to show Andrea a photo line-up that included a Hispanic suspect in other similar burglaries.[6] Decosta thought all the burglaries were related. However, no further action was taken because Andrea had moved out of the area and the suspect had been deported.

---

[6] According to the prosecutor, "there was an actual investigation of a person in the defendant's complex prowling, looking through people's windows. There was another little girl that accused someone of coming in her window and doing something to her. There was an investigation done. . . . The narrative with the little girl, the police don't have it anymore, so I have to have someone go out and find this little girl to rebut . . . the questions that counsel is going to ask Andrea on the stand."

Case No.: 5:14-cv-02641-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

12

Another hearing on the admissibility of the prowler incident was held out of the presence of the jury. Defense counsel argued, "there's evidence from which a jury could reasonably determine that the prowling incident was false." The court responded, "Isn't that a question of fact for the court to decide before it goes to the jury?" Defense counsel thought "some of the cases tend to indicate otherwise." He maintained that in most cases involving prior accusations of sexual assault, "there is a dispute as to whether or not the prior accusation was true or false," but the courts nevertheless allowed cross-examination and evidence of the prior false sexual assault accusation "even if the complaining witness insists and maintains that the . . . prior accusations were true." The prosecutor maintained that the defense had to prove the evidence was relevant, and to be relevant, the defense had to "actually prove that what the witness is saying is false. Not could be false but is actually false."

After reading and considering defendant's moving papers, reviewing the cited case law, and re-reading the police report, the court concluded that *People v. Alvarez* (1996) 14 Cal.4th 155, 201, was controlling. "In that case [the Supreme Court] said that the trial court in [the] *Alvarez* case kept that information [of a belated rape complaint] from coming into evidence in front of the jury because the trial court determined that . . . the theory of getting it before the jury was premised on the falseness of the complaint and if it's, in fact . . . false, then it bears on credibility. If the specific allegation of a prior rape was true, then . . . it would not be relevant to impeachment. [¶] And . . ., if it's not false and it's not true, the trial court in *Alvarez* found that it was . . . 'without sufficient support' . . . . [¶] . . . [¶] If it's without sufficient support in that we're speculating that the police might not have really felt it was a crime, that's deemed inadequate. . . ."

The court concluded: "It's not clear to me that this specific allegation is false. [¶] It seems to me we've got a ten-year-old girl. She describes what happens. The state of the house at the time the police get there is different than everybody remembered when they went to bed that night and it's consistent with her saying, well, a guy was in my room and ran out the door or left as soon as I started to make noise. [¶] And there's a sliding glass door that's open. That both the defendant and his wife say that the sliding glass door wasn't opened when they went to bed that night. [¶] [S]o it comes down to an opinion it seems to me or somebody has it in their mind that maybe she's not telling the truth, but that's not [] specific evidence that she wasn't telling the truth."

"[¶] Additionally, when then I think about where does this go. . . . It does seem to me that it does create an undue consumption of time because if we get into this we know the D.A. is going to have to bring in not only the officer but other additional witnesses will come in. He's going to want to bring in the officer that had the photo line-up where they had other indications that there was a person, in fact, doing this in the neighborhood. Then we get into the timing. [The defense is] going to want to get into that and say, well, that was X amount of time later that they did the photo line-ups and where did the guy go. It's going to create a great—the second part of 352 is: [i]s it going to create a substantial danger of confusing the issues or misleading the jury? [¶] And I find that under both *Alvarez* and 352 it would be unduly prejudicial and the prejudicial effect would outweigh the probative value as to the credibility of [Andrea] Doe."

Dkt. 16-3, pp. 265-268 (footnote in original).

The state appellate court determined that Andrea Doe's report of an intruder in her

bedroom may have been relevant and admissible pursuant to Evidence Code section 1103. Dkt.

16-3, pp. 269-270. Relying on <u>People v. Tidwell</u>, 163 Cal.App.4th 1447 (2008), the state

appellate court nevertheless held that the trial court did not abuse its discretion by excluding the evidence under Evidence Code section 352. Dkt. 16-3, pp. 270. The state appellate court reasoned as follows:

> *People v. Tidwell*, *supra*, 163 Cal.App.4th 1447, is particularly instructive. There, the defense wanted to present evidence that the complaining witness, R.C., had previously made two false rape complaints. As here, the evidence did not conclusively establish that the complaints were false. In upholding the trial court's exercise of discretion under Evidence Code section 352 to exclude the evidence, the Court of Appeal explained: "Although there was some evidence that R.C. made inconsistent statements, there was no conclusive evidence that her prior rape complaints were false. The defense was unable to obtain evidence from the men that R.C. accused, and inferences could be drawn either way from the circumstances of the prior incidents and R.C.'s statements concerning the incidents. In addition to the weaknesses in the evidence concerning falsity of the rape complaints, admitting the evidence would have resulted in an undue consumption of time as the defense attempted to bolster its view and the prosecution introduced evidence that Crawford had raped another female student. We, therefore, cannot say that the trial court abused its discretion in excluding the evidence based on the weak nature of the evidence of falsity of the complaints and the confusion of the jury and consumption of time it would have engendered for the parties to embark on the task of litigating the truthfulness of R.C.'s prior complaints." (*People v. Tidwell*, *supra*, 163 Cal.App.4th at p. 1458.).
>
> The same is true in this case. While there may have been enough evidence to permit the jury to decide whether or not Andrea Doe had fabricated or fantasized an encounter with a night time intruder, it was not unreasonable for the trial court in exercising its discretion to conclude the potential for undue consumption of time, confusion of issues, and prejudice, outweighed the marginal probative value of ambiguous evidence. Under these circumstances, no abuse of discretion appears.

Id. at p. 271. Further, the state appellate court rejected Petitioner's contention that the evidentiary ruling deprived him of the federal due process right to present a defense, and to confront and cross-examine witnesses. The state appellate court recognized that Evidence Code section 352 must bow to the due process right of a defendant, but that a defendant was not entitled to an unlimited inquiry into collateral matters. Id.

## Analysis

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of

the statements under state laws of evidence. Crawford v. Washington, 541 U.S. 36, 50-51 (2004). "[T]he right to cross-examine includes the opportunity to show [not only] that a witness is biased, [but also] that the testimony is exaggerated or [otherwise] unbelievable." Fowler v. Sacramento County Sheriff's Dept, 421 F.3d 1027, 1041 (9th Cir. 2005) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 51-52 (1987)).

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination." Ortiz v. Yates, 704 F.3d 1026, 1035 (9th Cir. 2012) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). A limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witnesses. United States v. Urena, 659 F. 3d 903, 907-908 (9th Cir. 2011). Restrictions on a criminal defendant's right to confront adverse witnesses "'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" Michigan v. Lucas, 500 U.S. 145, 151 (1991) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).

To determine whether a defendant's Sixth Amendment right of confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether the evidence was relevant; whether there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and whether the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness. See United States v. Beardslee, 197 F.3d 378, 383-84 (9th Cir.), amended, 204 F.3d 983 (9th Cir. 2000); see also Ortiz, 704 F.3d at 1036 (the reviewing court must decide whether the "proffered cross-examination sufficiently bore on [the witness'] credibility such that no fairminded jurist could disagree that the cross-examination could have influenced the jury's assessment of [the witness]; and whether any countervailing interests could reasonably have justified the trial court's curtailment of cross-examination") . Confrontation Clause claims are subject to harmless error analysis. United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case); see also United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005).

Here, the state appellate court's rejection of Plaintiff's Confrontation Clause claim was not contrary to, nor did it involve an unreasonable application of, Supreme Court precedent. Nor was it based on an unreasonable determination of the facts in light of the evidence presented at trial. As the state appellate court recognized, "the trial court was presented with evidence that gave rise to conflicting inferences, some of which supported a preliminary finding that the prowling incident actually occurred, and some of which did not." Dkt. 16-3, p.269. Even if evidence of the prowling incident was relevant under Evidence Code Section 1103, it was not unreasonable for the trial court to exercise its discretion to exclude the evidence pursuant to Evidence Code section 352 because the potential for undue consumption of time, confusion of issues and prejudice outweighed the marginal probative value of the ambiguous evidence.

Petitioner relies on Olden v. Kentucky, 488 U.S. 227, 232 (1988), however the case is distinguishable. In Olden, the trial court excluded evidence that the alleged rape victim and a witness were involved in an interracial extramarital relationship with each other at the time of the alleged rape. The defendant asserted consent as a defense and argued that the victim was claiming rape in order to protect her relationship with the witness. The trial court excluded evidence of the victim and witness' cohabitation and did not permit cross examination after the victim testified she was living with her mother. The trial court held that although the excluded evidence was relevant, the defendant's right to cross-examination was outweighed by the danger that revealing the interracial relationship would prejudice the jury against her. The Supreme Court held that the limitation on defendant's right to cross-examination was "beyond reason" because "[s]peculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [the victim's] testimony." Id.

Unlike in Olden, the evidence of the night intruder reported by Andrea was ambiguous, and therefore, Andrea's report of the incident did not have such "strong potential" to demonstrate the falsity of Andrea's testimony. Id. The evidence did not establish that Andrea's report of the intruder was fabricated or fantasized. Although her parents were skeptical of Andrea's report, they called the police because the sliding door was open. In addition, other people living near

Andrea had reported similar home intrusions; a suspect was identified; and an officer was sent to show Andrea a photo line-up.

Petitioner's reliance on <u>Fowler</u>, <u>supra</u>, is also misplaced. As a preliminary matter, the Supreme Court has repeatedly emphasized that "circuit precedent does not constitute 'clearly established' Federal law, as determined by the Supreme Court." <u>Glebe v. Frost</u>, 135 S.Ct. 429, 431 (2014) (per curiam). The <u>Fowler</u> case is also distinguishable. In <u>Fowler</u>, the defendant, who had a prior romantic relationship with the victim's mother, allegedly touched the 14 year-old victim's thighs, groin, breasts and nipples while applying lotion to her body and had a sexually explicit conversation with her. <u>Fowler</u>, 421 F.3d at 1030-31. The defendant conceded that he applied the lotion and had the conversation. He testified that the victim asked him to apply lotion and that he did so quickly and asexually. The prosecutor sought to prevent the defendant from cross-examining the victim about two other incidents of molestation the victim had reported about six years earlier. In the first incident, the victim claimed an acquaintance of her mother had repeatedly "grabbed her crotch" and "touched her butt" and had gone to jail or prison. <u>Id</u>. at 1032. The acquaintance was convicted of lewd acts against a friend of the victim but not the victim. <u>Id</u>. In the second incident, the victim alleged that her mother's then-boyfriend "put his hand between her legs on her private part and squeezed about four times." <u>Id</u>. The victim admitted to having been "a little cautious about things" and described the second incident as not "that big of a deal." <u>Id</u>. The mother contradicted the victim's statement. The defendant argued that the two incidents showed the victim had a tendency to be "supersensitive" to physical contact near sensitive areas by adult men and to misperceive, exaggerate and overreact. <u>Id</u>. at 1033. The trial court granted the prosecution's motion to preclude the proffered cross-examination, reasoning that (1) there was no "indication" that the victim actually overreacted or lied in the prior incidents, (2) the prior accusations were "very dissimilar" from those in the case, and (3) the prior accusations would be significantly more prejudicial than probative. <u>Id</u>.

The Ninth Circuit in <u>Fowler</u> held that the precluded cross-examination "sufficiently bore on [the victim's] reliability or credibility such that a jury might reasonably have questioned it."

United States District Court
Northern District of California

Id. at 1039. The Ninth Circuit rejected the trial court's characterization of the prior incidents as "very dissimilar" to the allegations against Fowler. Id. The Ninth Circuit also rejected the trial court's determination that the proposed cross-examination would consume an inordinate amount of time, reasoning that Fowler would simply have asked the victim about the prior incidents. Id. at 1040. Finally, the Ninth Circuit held that the erroneous preclusion of the two prior accusations had a substantial and injurious effect or influence in determining the jury's verdict, given that the victim's testimony was critical to the case; the victim's testimony was not cumulative; there was an absence of evidence either corroborating the defendant's account or contradicting the victim's account; and the prior incidents "bore on [the victim's] reliability and credibility in the specific context before the jury." Id. at 1043.

Unlike the prior incidents in Fowler, Andrea's report of a night intruder was significantly different from her accusations against Petitioner. Andrea reported that an unknown intruder came into her room and was kissing her face. In contrast, Andrea accused Petitioner, her stepfather, of repeatedly attempting to have sexual intercourse with her. As such, unlike Fowler, Andrea's report of the night intruder did not have a significant bearing on her reliability and credibility "in the specific context before the jury." Id. at 1043. Furthermore, in Petitioner's case, the potential for undue consumption of time and confusion of issues were greater than in Fowler and supported exclusion of the evidence pursuant to Evidence Code section 352. In Fowler, the defense estimated that the cross-examination regarding the prior incidents would take no more than an hour. Here, the trial court was concerned that the prosecutor would want to call several witnesses to bolster Andrea's report of the night intruder, and the defense would want to expend additional time refuting the prosecution's evidence.

Even assuming it was error to exclude Andrea's report of the night intruder, Petitioner has not shown that the error had a substantial and injurious effect on the jury's verdict. As stated previously, the evidence did not establish that Andrea's report of the intruder was fabricated or fantasized. Her parents, although skeptical, called the police because the sliding door was open. There was additional evidence to corroborate Andrea's report. Therefore, it is uncertain to what

extent, if any, Andrea's report of the night intruder would have diminished her credibility.

The state appellate court's determination on Petitioner's Sixth Amendment claim was not an objectively unreasonable application of clearly established Supreme Court law. Petitioner is not entitled to habeas relief on this claim.

### iii.    Claim re Prosecutor's Conduct during *Voir Dire* and Closing

Petitioner argues that prosecutorial misconduct during *voir dire* and closing argument violated his right to a fair trial and right to counsel under the Fifth, Sixth and Fourteenth Amendments.   More specifically, Petitioner contends that the prosecutor improperly vouched for the credibility of the prosecutor's integrity and the prosecution's witnesses and improperly attacked the defense function.

During voir dire, the prosecutor told prospective jurors "[o]ne thing that I promise you during this trial if you're picked as jurors, I will never try to trick you.  I will always be straightforward with you."  Dkt. No. 16-3, p. 272.  The trial court stopped the prosecutor and asked him to get to the question.  Later the prosecutor asked jurors about one of the questions in the juror questionnaire:  "A child may be called as a witness in this case.  Would you accept or reject the believability of the testimony of a child based on the witness [sic] age alone?"  Id.  The prosecutor said to the prospective jurors:

> "Let me ask you this.  Think about the worst thing, the most embarrassing thing that ever happened to you.  You don't have to tell me what it is.  I just want you to think about it.  And think about having to sit in that chair, turn towards 12 strangers and explain that to them.  How hard do you think that is?"

Id.  Defendant counsel objected that this was improper argument and the court sustained the objection.  Next the prosecutor asked the prospective jurors:  "Do you think it would be difficult for a child to sit on the stand and talk about something that's embarrassing?"  Id.  Defense counsel repeated his previous objection and the court overruled the objection.

During a break in voir dire, defense counsel stated his objection to the prosecutor's first comment (his "promise") as "improper for the prosecutor to insert into this process his personal credibility and honesty which I think is what he did . . ., and as we all know, statements of

attorneys are not evidence." Dkt. 16-3, pp. 272-73. Defense counsel asked for an admonition to the jury to disregard the prosecutor's comments. The trial court declined, stating: "[B]efore either party got up to begin their voir dire, I told them that whatever the attorneys say in court is not evidence. [S]o I'm going to leave it at that. I'm not going to make any admonition. I don't think it's necessarily an inappropriate comment. It does seem to be vouching for one's credibility, but I don't know that—we're going to give them the instruction again that what attorneys say is not evidence, so let's proceed from there." Dkt. 16-3, p. 273.

The state appellate court held that the prosecutor did not commit prejudicial misconduct under either state or federal law. The state appellate court characterized the prosecutor's comments as vouching for his own honesty and integrity, but found that "the court's swift intervention, coupled with its general admonitions that attorneys' statements are not evidence, and its later intervention when defense counsel raised the issue again in his voir dire, dissipated any residual aura of credibility that the prosecutor may have created around himself." Dkt. 16-3, p. 273. Moreover, the state appellate court concluded that "defense counsel had 'ample opportunity to correct, clarify, or amplify the prosecutor's remarks through his own voir dire questions and comments.'" Dkt. 16-3, p. 274 (quoting People v. Medina, 11 Cal.4th 694, 741 (1995)).

The state appellate court also found no prosecutorial misconduct with respect to the prosecutor's questions about child witnesses. The state appellate court stated: "We disagree that the prosecutor's comments were intended to have, or did have, the effect of inviting the jurors to vicariously experience the crime, or even of arousing the jurors' sympathy for the children because of their experiences. Nor is there any basis in the record for inferring that the jurors interpreted the prosecutor's comment[s] in that way." Dkt. 16-3, p. 274. The state appellate court also found it significant that the prosecutor's comments regarding child witnesses occurred "not during closing argument but during voir dire and they were not repeated." Id. at p. 275. The state appellate court concluded, "[W]e find no reasonable probability that a result more favorable to defendant would have been reached in the absence of the prosecutor's comments, assuming arguendo they amounted to misconduct." Dkt. 16-3, p. 275.

Petitioner also contends that the prosecutor engaged in misconduct during closing argument when he asked rhetorically, "What do we know?" and "How do we know?" (Dkt. 16-3, p.276) and said of a defense witness, "I *think* her testimony is suspect" (Dkt. 16-3, p. 277) (emphasis in original). Further, Petitioner contends that the prosecutor engaged in misconduct during his rebuttal when he made the following statements:

> It's kind of strange we have so much time to think. You kind of start reflecting on information you received when you first start doing this job. I remember I was doing my first trial and I was talking to an older prosecutor and we were talking about rebuttal argument and I asked him, how do you know what to rebut? How do you know what to rebut when the defense gets up and argues? And he told me look for the okie-doke. I said the okie what? What's the okie-doke? It's a trick. A slight [sic] of hand. It's the end or round, it's the reverse of everything you know. You just witnessed the okie-doke, ladies and gentlemen. That's exactly what that was.

Dkt. 16-4, pp.70-71. The prosecutor continued:

> Let me tell you something. When we first started and we did jury selection I front [sic] the fact there was DNA in this case, didn't hide it, didn't run from it. Counsel knew about it. In fact he knows the law. This is the instruction, it's called [E]vidence 222. You must decide what the facts are in this case. You must use only evidence that was presented in this courtroom. Evidence is sworn testimony of the witnesses, the exhibits entered into evidence and anything else his honor tells you to consider as evidence. He knows that. You decide this case based on the testimony, based on the evidence before you. You don't speculate, you don't guess, you examine the evidence as it was presented. You don't fall for the okie-doke, you don't fall for that.

Dkt. 1, p. 29-30. The prosecutor mentioned the "okie-doke" several more times:

> It's funny how he talked about a possible romantic encounter between Jessica Doe and this 300-pound man at the time. Anybody in the neighborhood see them together? Anybody see a rendezvous, any evidence about a rendezvous? Nothing at all. [W]hat did [defendant's] wife say? You can check the testimony yourself. She said Jessica and Michael had very little interaction . . . between them. The okie-doke, that is the okie-doke. . . .

> Then [defense counsel] tried to group Melissa with Jessica. . . . Absolutely no evidence of that. And [defense counsel] thinks just because he says it it's true. Where is the evidence? The okie-doke, it's straight-up okie-doke. . . .

> [Defense counsel] told you that the injuries to Jessica Doe were old. He had the nerve to get up here and tell you that when there's absolutely no evidence, no testimony that those injuries were old. It's the okie-doke. . . .

> [Defense counsel] described, when talking about Andrea, he said that, oh, you know, in this day and age there's HBO and there's all this stuff out there . . . . She described a sensation, a sensation. You don't get that from T.V. . . . . HBO, Showtime? Use your common sense. Don't fall for the okie-doke; do not fall for it. . . .

[I] asked Jessica, I said, counsel on cross said, oh, you didn't testify at the time of the preliminary hearing that he kissed you. You didn't tell Officer Landreth that he kissed you and I got up there and I said, did anyone ask you that. No. . . . Like she's lying. She's not lying. This young girl was raped. Don't fall for it. Don't fall for the okie-doke. . . .

Jessica said this about Michael. Jessica said that about Michael. It's the okie-doke. It's the okie-doke. Every chance Mr. [Defense counsel] got, he attacked Melissa. We all got it. We all got it. He's trying to take the focus off of his client. . . .

See Dkt. 16-3, p. 277, n. 10. Near the conclusion, the prosecutor referred to the instruction that the jury must make their decision on only the evidence and said, "that's the law. I'm not making this up. This ain't the okie-doke." Dkt. 1, p. 30.

With respect to the "we know" and "I think" comments, the state appellate court found no misconduct. The state appellate court reasoned that "the record presents us with no basis to infer that the jurors likely understood the prosecutor to be referencing insider information, or to be asking them to find certain facts or disbelieve certain witnesses because of his personal integrity or superior knowledge." Dkt. 16-3, p. 278. With respect to the "okie-doke" refrain, the state appellate court stated, "we need not decide whether the prosecutor's comments constituted misconduct because we are convinced the comments could not have affected the outcome of the trial." Id. The state appellate court also held that defense counsel's failure to object to the prosecutor's conduct described above did not amount to ineffective assistance of counsel because in the court's view, "this is exactly the sort of situation in which competent counsel might make a tactical decision to refrain from objecting, if in his or her estimation the client had more to lose than to gain by challenging the prosecutor during rebuttal argument." Id.

Analysis

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under Darden, the

first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005); see also Deck v. Jenkins, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that Darden is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes). A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995); see Trillo v. Biter, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

The state appellate court's determinations on the issue of prosecutorial misconduct were not contrary to, nor did they involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. First, even assuming the prosecutor engaged in "vouching," his conduct did not rise to the level of a cognizable due process violation. As noted by the state appellate court, the trial court instructed the jury before beginning *voir dire* that the comments of counsel are not evidence and reacted swiftly to the prosecutor's comments and defense counsel's objections. The jury is presumed to follow the court's instructions in the absence of evidence to the contrary. Armitage v. Brazelton, No. 13-2236, 2015 WL 673644 (E.D. Cal. Feb. 17, 2015) (citing Weeks v. Angelone, 528 U.S. 225, 234 (2000) and Richardson v. Marsh, 481 U.S. 200, 206 (1987)). Second, the trial court sustained the prosecutor's first question regarding child witnesses. Arguably, the prosecutor's second question ("do you think it would be difficult for a child to sit on the stand and talk about something that's embarrassing?") may have invoked the prospective jurors' sympathies. Nevertheless, the question was posed at the beginning of the trial process, and as the state appellate court noted, "as a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict." Dkt. 16-3, p. 275 (citing People v. Thomas, 53 Cal.4th 771, 797 (2012)).

United States District Court
Northern District of California

Third, with respect to the prosecutor's comments during closing argument, defense counsel did not object. The state appellate court observed that ordinarily, claims of prosecutorial misconduct are forfeited by the failure to object. Dkt. 16-3, p. 23. In any event, as the state appellate court observed, the "we know" and "I think" comments did not suggest the prosecution had insider information or superior knowledge and did not amount to misconduct. The state appellate court also held that the "okie-doke" refrain could not have affected the outcome of the trial. Id. at p. 24. In making these determinations, the state appellate court rejected Petitioner's claim for prosecutorial misconduct and implicitly rejected his claim for ineffective assistance of counsel.

The claim for ineffective assistance of counsel fails. To establish a claim for ineffective assistance of counsel, a petitioner must show: (1) that the representation he received "fell below an objective standard of reasonableness" and (2) prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). Petitioner has not established either prong. As stated previously, the "we know" and "I think" comments were not suggestive of insider information or superior knowledge. The "okie-doke" refrain, when viewed in context, was not an accusation that defense counsel lied or fabricated evidence. Instead, the prosecutor's theme with the "okie-doke" refrain was that defense counsel's arguments were diversions. See Dkt. 16-1, pp. 139-148.

In sum, the prosecutor's comments, whether considered individually or in the aggregate, did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. The Petitioner is not entitled to relief on his prosecutorial misconduct claim.

### iv. Claim re Cumulative Effect

Lastly, Petitioner contends that he is entitled to relief because the cumulative effect of the purported trial errors described above was so prejudicial as to amount to a deprivation of due process.

It has been held that in some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir.

United States District Court
Northern District of California

2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).

Petitioner has not established a constitutional violation on any of his claims. Accordingly, Petitioner has failed to show cumulative prejudice to warrant federal habeas relief. See Hayes, 632 F.3d at 524. The state court's rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on his claim of cumulative error.

## IV. CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be DENIED. Further, a Certificate of Appealability is DENIED. See Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases. The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

Dated: March 31, 2018

IT IS SO ORDERED

EDWARD J. DAVILA
United States District Judge